UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

DENEAL LEE SMITH,

               Petitioner,

v.

CATHERINE S. BAUMAN,

               Respondent.

_____/

Case No. 2:23-cv-110

Honorable Jane M. Beckering

## **<u>OPINION</u>**

     This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner DeNeal Lee Smith is incarcerated with the Michigan Department of Corrections at the Kinross Correctional Facility (KCF) in Kincheloe, Chippewa County, Michigan. On February 28, 2020, following a jury trial in the Allegan County Circuit Court, Petitioner was convicted of two counts of armed robbery, in violation of Mich. Comp. Laws § 750.529, and one count of fourth-degree fleeing and eluding a police officer, in violation of Mich. Comp. Laws § 257.602a(2).[1] On April 13, 2020, the court sentenced Petitioner as a fourth-offense habitual offender, Mich. Comp. Laws § 769.12, to concurrent terms of 30 to 45 years of imprisonment for each armed robbery conviction, and 2 to 15 years of imprisonment for the fleeing and eluding conviction.

     On June 23, 2023, Petitioner filed his habeas corpus petition raising three grounds for relief, as follows:

---

[1] Petitioner was acquitted of three counts of possession of a firearm during the commission or attempted commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b, and one count of felon in possession of a firearm, in violation of Mich. Comp. Laws § 750.224f.

I.      Trial court violated Petitioner's right to self-representation at trial.

II.     Trial court's interference with counsel's cross-examination of a witness violated right to due process of the law.

III.    Petitioner was denied his constitutional right to confront and question the witnesses against him.

(Pet., ECF No. 1, PageID.5–8.) Respondent contends that Petitioner's grounds for relief are meritless. (ECF No. 10.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

### I.    Factual Allegations

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

> On October 15, 2018, at approximately 8:41 p.m., the Clark gas station on 10th Street in Martin, Michigan, was robbed. The clerk testified at [Petitioner's] trial that he looked up at the sound of the door chime and saw a gun pointed at his head. The robber demanded that the clerk give him all the money from the register, and the clerk complied. The clerk described the robber as a black male, with a black shirt around his face, wearing black sunglasses and gray gloves. The robber grabbed the money and a black plastic bag that he had brought with him. The robber left the store, and the gas station's manager, who had been in his office doing paperwork, followed him, hopped into his car, and began to pursue the robbery suspect, who ran north through some bushes and got into a car parked in a driveway just north of the gas station. A call about the robbery went out from dispatch at approximately 8:42 p.m. Officers from Otsego Police Department, Allegan County Sheriff's Department, and the Michigan State Police (MSP) responded.

> According to the gas station manager, the suspect led him on a high-speed chase down local roads and onto U.S. 131. At some point, the manager wrote the license plate of the fleeing car on his arm. When the suspect led the manager onto northbound U.S. 131, the manager saw Otsego Police Officer Michael Gudith sitting in his patrol car in the median, watching southbound U.S. 131 for any sign of the suspect. The manager stopped and gave Officer Gudith a description of the suspect's car and the car's license plate number, and told him that the suspect was headed northbound on U.S. 131. Officer Gudith got onto northbound U.S. 131 and informed other units that the suspect was last seen "northbound from the 106th area

2

in a Chevy Impala." Officer Gudith caught up with the suspect's car, observed that the license plate number was identical with the one the store manager had given him, and notified other units that he was following the suspect and of their location. The suspect pulled off at Exit 55, the exit for Martin, then drove over the highway and down the ramp to merge onto southbound U.S. 131. Officer Gudith, Allegan County Sheriff's Deputy William Greene, and MSP Trooper Michael Shaw followed, lights and sirens activated. The suspect pulled onto the shoulder of U.S. 131, slowed almost to a stop, but then pulled back into the lane of travel, repeating this weaving motion several times for approximately two miles. Eventually, the suspect pulled onto the right shoulder of the highway and stopped. The suspect, who turned out to be [Petitioner], was arrested, transported to the Allegan County Sheriff's Department, and eventually charged with two counts of armed robbery, one count each of fourth-degree fleeing and eluding and felon-in-possession of a firearm, and three counts of felony-firearm.

After [Petitioner] left the scene, Allegan County Sheriff's Deputy William Greene searched [Petitioner's] car, collecting and placing into evidence a pair of black sunglasses; a black, long-sleeved thermal top; and a pair of gray knit gloves; all items that were consistent with what Deputy Greene had been informed the robber was wearing. He stayed with [Petitioner's] car until it was towed to the Sheriff Department's secure garage. At about midnight, Allegan County Sheriff's Deputy Ryan Rewa discovered a black plastic bag 15 to 20 feet from the edge of the roadway in a cornfield, approximately a quarter mile south of the Clark station. He called his find into dispatch, who turned the information over to Deputy Greene. Deputy Greene came to the location, used a pair of plastic gloves to collect the bag, and placed it into an evidence bag.

Allegan County Sheriff's Department Detectives Mark Lytle and Craig Gardiner searched [Petitioner's] car again on October 16, looking specifically for a gun and for the money stolen from the gas station. Among the items searched was a pair of jeans, the pockets of which Detective Lytle turned inside out, finding a few dollars, but nothing more, and a red hoodie sweatshirt, which Detective Lytle picked up by the hood and ran his hands down. No evidence was recovered. On October 24, Allegan County Sheriff's Deputy Cory Harris, an evidence technician, searched [Petitioner's] car again, as a result of a mix-up. Deputy Harris's superior had intended for him to process a stolen car that had been recovered from Holland to determine if there was any evidence indicating who stole the car. The stolen car was a brown (or gold) Chevrolet Malibu, but Deputy Harris received instructions to "tech" the silver (or gray) Chevrolet Impala, which happened to be [Petitioner's] car. As he was processing [Petitioner's] car, Deputy Harris found $232 dollars wadded up and shoved into the red hoodie on the back seat.

The gas station clerk, the store manager, and all of the law enforcement officials involved in the pursuit and arrest of [Petitioner], in the subsequent investigation of the robbery, and in the search of [Petitioner's] car, testified at [Petitioner's] trial. The jury also heard from two experts who analyzed information obtained from [Petitioner's] phone and concluded that he was in the area of the robbery at the time

3

the robbery occurred. The jury also heard from forensic scientists who concluded from their analysis of DNA obtained from the handle of the black plastic bag found by Deputy Rewa that [Petitioner] had contributed 70% of the DNA obtained and that it was "at least 150 septillion times more likely" that the DNA on the plastic bag came from [Petitioner] and three random individuals than that it came from four random individuals.

Testifying on his own behalf, [Petitioner] explained that he was driving from Kalamazoo, where he had spent the weekend with his brother, back to his home in Grand Rapids, when he stopped at the Dollar Store in Martin, near the gas station, to purchase something to repair his tire, snacks, and a two-pack of cigars. In the parking lot, he emptied the tobacco from one of the cigars and stuffed the wrapper with marijuana. He was headed back to Kalamazoo on southbound U.S. 131 to pick up the medical marijuana that he had purchased earlier that day but accidently left at his brothers. However, he remembered that his brother would not be home and that he did not have a key to his brother's apartment. Consequently, he exited the highway, drove over the overpass, and then onto the ramp that would take him northbound on U.S. 131. As he was merging onto U.S. 131, he saw several police cars behind him with their lights on. Unaware of having violated a traffic law, [Petitioner] said that he was high, scared, and hysterical, and he drove on. He eventually stopped, got out of the car, and went straight to the police. [Petitioner] denied that the man in the gas station surveillance video was him. Although he weighed 235 pounds at the time of the trial, at the time of the robbery, he weighed only 190 pounds; the clothes that the police retrieved from his vehicle were his, but they would not fit him now. He denied owning a mask, tying a shirt around his face, throwing anything out the window of his car, or having $232 in the pocket of his red hoodie. Asked how he explained his DNA on the black plastic bag, [Petitioner] explained that Sergeant Greene collected the bag and put it with other items that the sergeant had collected from [Petitioner], and his DNA transferred from these items to the bag.

*People v. Smith*, No. 353734, 2022 WL 814619, at *1–2 (Mich. Ct. App. Mar. 17, 2022).

Jury selection for Petitioner's trial occurred on February 25, 2020. (Trial Tr. I, ECF No. 11-5.) Over the course of three days, the jury heard testimony from numerous witnesses, including the gas station clerk, law enforcement officials, and Petitioner himself. (Trial Tr. I, II, & III, ECF Nos. 11-5, 11-6, 11-7.) On February 28, 2020, after about two hours of deliberation, the jury reached a guilty verdict with respect to the armed robbery charges and the fleeing and eluding charge. (Trial Tr. IV, ECF No. 11-8, PageID.1543.) Petitioner appeared before the trial court for sentencing on April 13, 2020. (ECF No. 11-9.)

4

Petitioner, with the assistance of appellate counsel, appealed his convictions and sentence to the Michigan Court of Appeals, raising the following claims for relief: (1) the trial court violated his constitutional right to self-representation; (2) the trial court violated due process by depriving Petitioner of a meaningful opportunity to present a defense and confront the witnesses against him; and (3) the trial court allowed the prosecution to present extensive hearsay evidence, and counsel rendered ineffective assistance by not objecting to such hearsay. *Smith*, 2022 WL 814619, at *3–7. The court of appeals affirmed Petitioner's convictions and sentences on March 17, 2022. *Id.* at *1. The Michigan Supreme Court denied Petitioner's application for leave to appeal on December 7, 2022. *See People v. Smith*, 981 N.W.2d 727 (Mich. 2022). This § 2254 petition followed.

## II.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

6

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

### III.     Discussion

#### A.     Ground I—Self-Representation

As his first ground for relief, Petitioner contends that the trial court violated his right to represent himself at trial. (Pet., ECF No. 1, PageID.5.) According to Petitioner, he made a motion to represent himself eight months before trial. (*Id.*) Petitioner avers that the "trial court responded to the request as a genuine request by explicitly considering and denying the request." (*Id.*)

The Sixth Amendment provides that a criminal defendant shall have the right to the assistance of counsel for his defense. U.S. Const. amend. VI. At issue here is a corollary to that right, the right to self-representation. *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942) ("The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms."). The clearly established federal law regarding self-representation is expressed in two Supreme Court cases: *Faretta v. California*, 422 U.S. 806 (1975), and *Martinez v. Ct. of App. of Cal.*, 528 U.S. 152 (2000).

In *Faretta*, the Supreme Court found support for the right of self-representation in the structure of the Sixth Amendment right to the assistance of counsel:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.
>
> The counsel provision supplements this design. It speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an

assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. . . . This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense.

*Faretta*, 422 U.S. at 819–821 (footnotes and citations omitted).

Although the Supreme Court recognized a criminal defendant's right to self-representation, it acknowledged that the right was a qualified one. The constitutional mandate to provide counsel to a criminal defendant is premised upon the fact that "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Id*. at 834. Because a criminal defendant representing himself relinquishes that benefit, his waiver must be "knowingly and intelligently" made. *Id*. at 835. Moreover, the right to self-representation must yield to "the dignity of the courtroom." *Id*. at 834 n.46. It is not a license to ignore the rules of procedure or engage in "obstructionist misconduct." *Id*.

Furthermore, a defendant must assert his or her right to self-representation "clearly [and] unequivocally." *United States v. Powell*, 847 F.3d 760, 774 (6th Cir. 2017). If the defendant fails to do so, the right "may be deemed forfeited as a threshold manner." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (en banc). However, "in situations where a defendant clearly, unequivocally, and timely invokes the right to self-representation, the trial court must inform the defendant 'of the dangers and disadvantages of self-representation.'" *Cassano v. Shoop*, 1 F.4th 458, 466 (6th Cir. 2021) (quoting *Faretta*, 422 U.S. at 835). Additionally, "*Faretta* does not require a trial judge to permit 'hybrid' representation . . . . A defendant does not have a constitutional right to choreograph special appearances by counsel." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984).

9

In *Martinez*, 528 U.S. at 152, the Supreme Court concluded that the right of self-representation did not extend to appeals. In reaching its conclusion, the Supreme Court commented on the scope of the right of self-representation established in *Faretta*, stating:

> As the *Faretta* opinion recognized, the right to self-representation is not absolute. The defendant must "'voluntarily and intelligently'" elect to conduct his own defense, and most courts require him to do so in a timely manner. He must first be "made aware of the dangers and disadvantages of self-representation." A trial judge may also terminate self-representation or appoint "standby counsel"—even over the defendant's objection—if necessary. We have further held that standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not "seriously undermin[e]" the "appearance before the jury" that the defendant is representing himself. Additionally, the trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal "chores" for the defendant that counsel would normally carry out. Even at the trial level, therefore, the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.

*Martinez*, 528 U.S. at 161–162 (citations and footnote omitted).

Petitioner raised this ground for relief on direct appeal, and the court of appeals addressed it under the following standard:

> "The right of self-representation is guaranteed by both the Michigan Constitution, Const. 1963, art., § 13, and by statute, MCL 763.1." *People v. Dunigan*, 299 Mich. App. 579, 587; 831 N.W.2d 243 (2013). It is also "implicitly guaranteed by the Sixth Amendment of the United States Constitution." *Id.*

> > Upon a defendant's initial request to proceed pro se, a court must determine that (1) the defendant's request is unequivocal, (2) the defendant is asserting the right knowingly, intelligently, and voluntarily through a colloquy advising the defendant of the dangers and disadvantages of self-representation, and (3) the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court and the administration of the court's business. [*People v. Russell*, 471 Mich. 182, 190; 684 N.W.2d 745 (2004).]

> The trial court must also satisfy the requirements of MCR 6.005(D), *id.* at 190–191, which states that the trial court may not permit the defendant's initial waiver of the right to counsel without:

10

> (1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and
>
> (2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer. [MCR 6.005(D).]
>
> Technical knowledge of legal matters "simply has no relevance to an assessment of a knowing exercise of the right to self-representation." *People v. Brooks*, 293 Mich. App. 525, 539–539; 809 N.W.2d 644 (2011), judgment vacated in part on other grounds, appeal denied in part on other grounds, 490 Mich. 993 (2012). A request for self-representation does not become equivocal as a matter of law when accompanied by a request for stand-by counsel. *People v. Hicks*, 259 Mich. App. 518, 527–528; 675 N.W.2d 599 (2003). The trial court should rule in favor of denying defendant's request for self-representation when there is uncertainty as to whether the waiver requirements have been satisfied. *Russell*, 471 Mich. at 191. "[I]t is a long-held principle that courts are to make every reasonable presumption *against* a waiver of a fundamental constitutional right, including the waiver of the right to the assistance of counsel." *Id.* at 188.

*Smith*, 2022 WL 814619, at *3. Although the court of appeals cited state law for the standard, the cases cited in *Dunigan* notes that *Faretta* is the source of the standard. *See People v. Anderson*, 247 N.W.2d 857, 859 (Mich. 1976). Thus, there is no question that the court of appeals applied the correct standard.

The court of appeals' application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

[A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the court of appeals applied the correct standard—here *Faretta* rather than *Strickland*—Petitioner can only overcome the deference afforded to state court decisions if the determination regarding Petitioner's self-representation argument is an unreasonable application of *Faretta* and *Martinez* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

After setting forth the standard, the court of appeals applied it in the following thorough discussion:

[Petitioner's] request to represent himself came at the end of the second day of . . . an evidentiary hearing, after the trial court had denied his motion to suppress statements made at his arrest and the cash found in his car. At the conclusion of the hearing, the trial court asked if there were any other issues to address before setting a trial date. [Petitioner] indicated that he wanted to speak to the court. After a brief consultation with [Petitioner] in the jury room, defense counsel stated to the trial court that [Petitioner] wanted to represent himself. Asked by the trial court if he wanted to represent himself, [Petitioner] said that he did, and would like his current, retained attorney "to be co-counsel." In response to the trial court's questioning, [Petitioner] indicated that he did not believe that his attorney saw the evidence in the same way that he did and would not cross-examine the prosecution's witnesses in a way that [Petitioner] saw fit. [Petitioner] stated that he could prove that the money was planted in his car; [Petitioner] reasoned that prior searches had not uncovered the money, so it had to come from somewhere. [Petitioner] explained that if he had the money he would hire another attorney, but he gave all his money to his current attorney and did not have any more.

12

The trial court denied [Petitioner's] request to represent himself, reasoning without elaboration that [Petitioner] was not "in a position" to understand the risks of self-representation and did not have the ability to represent himself. The trial court gave [Petitioner] a choice between keeping his current attorney or getting a court-appointed attorney. [Petitioner] stated that he would be willing to take the court-appointed attorney that he had before he hired his current attorney, but continued to insist that he believed he could represent himself.

Because the trial court did not explain the risks of self-representation to [Petitioner], the basis for the trial court's conclusion that [Petitioner] did not understand them is unclear from the record. To the extent that the trial court's determination that [Petitioner] was not in a position to understand the disadvantages of self-representation implicated [Petitioner's] comprehension, "[c]redibility is crucial in determining a defendant's level of comprehension, and the trial court is in the best position to make this assessment." *Williams*, 470 Mich. at 640 (quotation marks and citations omitted). The record is equally unclear regarding the basis for the trial court's determination that [Petitioner] lacked the ability to represent himself. Assuming that [Petitioner's] lack of ability referred to his competence, competence is a pertinent consideration when determining whether [Petitioner] knew what he was doing and chose to represent himself with "eyes open." *People v. Anderson*, 398 Mich. 361, 368; 247 N.W.2d 857 (1976). However, "competence does not refer to legal skills, for his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." *Id.* (cleaned up).

The prosecution argues on appeal that [Petitioner's] request to represent himself was equivocal. We agree. If a defendant's request to represent himself or herself is not unequivocal, a trial court is not required to inquire further into the matter. *See id.* (stating that "once the defendant has unequivocally declared his desire to proceed Pro se the trial court must determine whether defendant is asserting his right knowingly, intelligently, and voluntarily"). The equivocal nature of [Petitioner's] request to represent himself is evinced by his statement that he would hire another attorney if he could afford one, but he had spent all of his money on his current attorney. Notwithstanding [Petitioner's] assertions that he could represent himself, this response indicated that he preferred to be represented by a retained attorney, but could not afford one. Given the choice between his current attorney and a court-appointed attorney, [Petitioner's] response that he would be willing to be represented by his prior court-appointed attorney further suggests [Petitioner's] preference for representation. It also might explain why the trial court did not advise [Petitioner] of the risks involved in self-representation, among other things. *See* MCR 6.005(D).

Given [Petitioner's] equivocal assertion of the right to represent himself, deferring to the trial court's credibility determinations regarding [Petitioner's] ability to comprehend the risks of self-representation and his competence to represent himself, and mindful of the presumption against waiver of the right to counsel, *see*

13

*Russell*, 471 Mich. at 188, we affirm the trial court's determination that [Petitioner] did not validly waive his constitutional right to counsel.

*Smith*, 2022 WL 814619, at *3–4.

In his reply brief, Petitioner suggests that the court of appeals made an unreasonable determination of the facts because his situation is akin to those present in *Faretta* as well as *Jones v. Jamrog*, 414 F.3d 585 (6th Cir. 2005). (ECF No. 12, PageID.2031.) Petitioner argues that he would have "preferred representation by counsel if he had the money to hire one of his choice." (*Id.*, PageID.2032.) Petitioner likens his desire to Faretta's, as the *Faretta* Court noted that Faretta had "urged without success that he was entitled to counsel of his choice, and three times moved for the appointment of a lawyer other than the public defender." *Faretta*, 422 U.S. at 810 n.5.

Petitioner also likens his preference to Jones, who "said that he would have retained his counsel if it were not for the state's restrictive discovery policy." *Jones*, 414 F.3d at 593–94. The discovery policy at issue set forth that police reports would be provided only to the attorney of record, and that Jones would only be able to review the reports "when his attorney was available to do so and only for as long as the attorney had time." *Id.* at 592. The Sixth Circuit held that while Jones' request to proceed *pro se* was contingent on whether the state would sustain that discovery policy, the state courts unreasonably applied *Faretta* by concluding that Jones' "waiver was involuntary solely because there were identifiable—yet purely hypothetical—circumstances under which Jones would have preferred a lawyer." *Id.* at 593.

*Jones* also set forth that "[o]n habeas review, a court must 'indulge every reasonable presumption' against waiver of the right to counsel.'" *Id.* at 596 (quoting *Fowler v. Collins*, 253 F.3d 244, 249 (6th Cir. 2001)). Here, Petitioner's request regarding self-representation occurred at the end of the evidentiary hearing held on June 25, 2019. (Mot. Hr'g Tr., ECF No. 11-3, PageID.578.) Petitioner told the court that he wanted to represent himself and have his retained

14

attorney serve as cocounsel. (*Id.*) The court advised Petitioner "that's not going to work." (*Id.*) The court also asked Petitioner to explain why he did not want his attorney to represent him, and Petitioner responded that they "had different thoughts and different opinions on different issues in the case." (*Id.*, PageID.579.)

The court went on to ask Petitioner about his education background, and Petitioner replied that he had earned a GED. (*Id.*, PageID.584–85.) Petitioner noted that he had never represented himself before, and that he "believe[d]" counsel could give him a "crash course" regarding the Michigan Rules of Evidence and jury selection. (*Id.*, PageID.585.) The trial court and Petitioner then engaged in the following exchange:

> THE COURT: You have to follow the same rules that other—an experienced lawyer follows.
>
> MR. SMITH: Yes, ma'am. I plan on it.
>
> THE COURT: But you don't know what the rules are, right?
>
> MR. SMITH: Yes, ma'am. Ma'am, if I—I mean, if I had the money to hire another attorney, I would. But I gave my money to Mr. Lambert, so I—I—I don't have the money. And I still want his (inaudible) expertise.
>
> THE COURT: Your other choice is to have a court appointed attorney, and the Court is willing to appoint you an attorney if you don't want Mr. Lambert to represent you. But your choices are, because I don't believe you understand the disadvantages of self-representation. I don't think you are—have the ability to represent yourself. So you either stick with Mr. Lambert or the Court will appoint you an[] attorney. It's up to you.
>
> MR. SMITH: Your Honor, I don't understand—
>
> THE COURT: Well, I am telling you what the—what I am ordering. So that's what you have to decide. Do you want to keep Mr. Lambert or do you want a court appointed attorney?
>
> MR. SMITH: Your Honor, I would like to represent—
>
> THE COURT: I am denying your right to represent yourself. I don't believe that you are in a position where you understand the disadvantages of self-representation.
>
> MR. SMITH: I do. I do, your Honor.

THE COURT: I know that you don't agree with my decision and I appreciate that and I understand you don't agree. But I disagree with you and I get to make that decision, not you. So I need to know from you if you want to keep Mr. Lambert or you wish to have court appointed counsel.

MR. SMITH: Your Honor, if—if—if I may, I had—before I hired Mr. Lambert, I had an attorney by the name of Mr. McEwen, James McEwen. If I can get him back, then I will take him.

THE COURT: You can't get him back, he is no longer doing court appointed work. He is resigned from the court appointment schedule. The Office of the Public Defender makes the decisions as to who represents who at this point in time. We have a new Office of Public Defender and that's how we proceed. So that's a decision you have to make. I will give you another few days to make that decision, but you need to advise the Court in writing and you can send that through the jail as to how you would like to proceed. But I need to know by Friday at 5 p.m.

MR. SMITH: That's fine. With—with all due respect, ma'am, I believe I can—I believe I am (inaudible) to represent myself.

THE COURT: I said I already decided that motion, Mr. Smith. I know you don't agree with it, like I said, but I have already decided.

(*Id.*, PageID.585–587.)

In light of the foregoing, and after reviewing the record, this Court concludes that the court of appeals' rejection of Petitioner's self-representation claim was neither an unreasonable application of *Faretta* nor an unreasonable determination of the facts. As noted *supra*, at the outset, Petitioner stated: "I would like to represent myself. And I would like Mr. [Lambert] to be cocounsel." (*Id.*, PageID.578.) Subsequently, Petitioner twice stated that he wanted to benefit from Mr. Lambert's assistance and expertise. (*Id.*, PageID.579, 585–86.) Petitioner also noted that if he had the money to hire another lawyer, he would. (*Id.*, PageID.586.) Petitioner also represented if his prior court-appointed counsel were available, he would "take him." (*Id.*, PageID.587.) Thus, although Petitioner expressed his desire to represent himself, he couched that request on his desire to still benefit from Mr. Lambert or another attorney's expertise.

16

In his reply brief, Petitioner argues that the state courts "understood [that Petitioner] was requesting for his attorney to stay on as 'stand-by' counsel although labeling it co-counsel." (ECF No. 12, PageID.2022.) Petitioner, however, provides no evidentiary support for this speculative belief. Contrary to Petitioner's argument, "co-counsel" and "standby counsel" are two completely different terms. "Co-counsel" suggests an individual who is "equal to . . . trial counsel in representation." *Hudson v. Larson*, No. 13-12254, 2015 WL 1912577, at *1 (E.D. Mich. Apr. 27, 2015). On the other hand, standby counsel's role is one of an "observer, an attorney who attends the proceeding and who may offer advice, but who does not speak for the defendant or bear responsibility for his defense." *Childress v. Johnson*, 103 F.3d 1221, 1231 (5th Cir. 1997) (quoting *United States v. Taylor*, 933 F.2d 307, 312–13 (5th Cir. 1991)); *see also Taylor*, 933 F.2d at 312 (holding that "[g]iven the limited role that a standby attorney plays, we think it clear that the assistance of standby counsel, no matter how useful to the court or the defendant, cannot qualify as the assistance of counsel required by the Sixth Amendment. There can be no question that the roles of standby counsel and full-fledged defense counsel are fundamentally different."). Given the fundamental differences between co-counsel and standby counsel, it was reasonable for the state courts to not understand that Petitioner was using the term "co-counsel" as a synonym for "standby counsel."

The general standard articulated in *Faretta* means that "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). As the court of appeals recognized, Petitioner's request to represent himself was not unequivocal. Instead, Petitioner qualified that request on having Mr. Lambert serve as "co-counsel" or by still benefiting from Mr. Lambert's expertise and skill as an attorney. Moreover, Petitioner also noted that he would be willing to accept his prior court-appointed

attorney. As this Court has noted, "[n]othing in *Faretta* or subsequent cases indicates that a defendant has a constitutional right to represent himself in only some portions of his defense." *Peoples v. Davids*, No. 1:19-cv-156, 2021 WL 1147188, at *7 (W.D. Mich. Jan. 22, 2021) (citing *McKaskle*, 465 U.S. at 183), *report and recommendation adopted by* 2021 WL 1146122 (Mar. 25, 2021). Given the way in which Petitioner requested to represent himself, the court of appeals reasonably determined that Petitioner had not unequivocally expressed a desire to represent himself and waive counsel. Under these circumstances, Petitioner fails to demonstrate that the state courts' rejection of his self-representation challenge is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief with respect to habeas ground I.

### B.    Grounds II and III—Confrontation and Cross-Examination Issues

Petitioner's second and third grounds for relief both relate to alleged interference with Petitioner's right to confront the witnesses against him during trial. As his second ground for relief, Petitioner faults the trial court for interfering with defense counsel's cross-examination of the lead investigator, Detective Craig Gardiner. (Pet., ECF No. 1, PageID.7.) Specifically, Petitioner asserts that the trial court did not allow defense counsel to question Gardiner about concerns that he had tampered with evidence. (*Id.*) As his third ground for relief, Petitioner avers that the trial judge "allowed the lead investigator to simply pawn everything he wrote in multiple affidavits on [third parties] without allowing the defense to question who gave him which information." (*Id.*, PageID.8.) Petitioner suggests that the trial court "ordered the defense counsel to move on from the affidavit questions[,] not allowing impeachment of" the investigator. (*Id.*)

Petitioner raised these grounds on direct appeal, and the court of appeals addressed them under state law due process standards. *Smith*, 2022 WL 814619, at *5. The court of appeals disagreed with Petitioner that the "trial court's evidentiary decisions violated his right to a fair trial

by depriving him of the meaningful opportunity to present a defense and to confront the witnesses against him." *Id.* Specifically, the court of appeals noted:

> Detective Gardiner was the lead detective in this case. He retired before [Petitioner's] trial, but was the officer who submitted the four search warrant affidavits in this case. In the two affidavits which [Petitioner] finds issue, Detective Gardiner attested to observations that he did not personally make; rather, he relied on information obtained from officers who had investigated the robbery. Defense counsel sought to impeach the detective by using the affidavits to establish that he lied under oath because, as the affiant, he attested to observations that he had not personally made. The affidavit used to obtain a search warrant on October 16 stated that the gas station manager advised the affiant, i.e., Detective Gardiner, that he was certain that the person he followed in his car was the robbery suspect, but defense counsel elicited testimony from Detective Gardiner that he did not remember talking to the manager on October 16. Defense counsel also asked Detective Gardiner about the statement in a second affidavit that the affiant interviewed the manager, who said that he followed the suspect's car onto U.S. 131 and wrote the license plate number on his arm. After the prosecutor objected to defense counsel's attempt to impeach the detective with statements that other officers had given him, the trial court prohibited defense counsel from pursuing her line of inquiry, explaining, "The issue is if it's a statement that he got from another officer then that officer is the one that should be questioned about it, not this officer."

> Detective Gardiner acknowledged on direct examination, as well as on cross-examination, that he based his affidavit in part on information gathered by other officers, and that "search warrant affidavits are basically a combined, joint effort where you rely on other officer's information." [Petitioner] did not challenge this testimony, nor has he presented on appeal either argument or evidence establishing that this practice is improper and constitutes lying under oath. Assuming for the sake of argument that the practice is inappropriate, the record does not support [Petitioner's] claim that the trial court violated his right to present a complete defense by disallowing additional cross-examination of the detective about the affidavits. Defense counsel's goal at trial was to impeach the detective's credibility by establishing that he lied under oath on the affidavits. The trial court's decision did not undermine [Petitioner's] defense because, as shown, the jury heard testimony that would have allowed it to reach the conclusion that [Petitioner] sought.

> Next, [Petitioner] argues that the trial court deprived him of a fair trial by constraining [Petitioner's] cross-examination about the multiple searches of his car by threatening that questioning the searches would open the door to the prosecution's introduction of evidence that [Petitioner] was on parole for armed robbery at the time the charged armed robbery was committed. The record does not support this claim of error.

One of [Petitioner's] theories of defense was that someone planted the cash in his car between the October 16 search by Detectives Lytle and Gardiner, which turned up nothing, and the October 24 search by Deputy Harris, which turned up the cash. Video from the department's garage showed that Detective Gardiner went into the car early on October 23, and defense counsel wanted to question Detective Gardiner about this incident. Although skeptical of the relevance of Detective Gardiner's October 23 entry into [Petitioner's] car, the trial court nevertheless allowed defense counsel to cross-examine the detective about it. Defense counsel established through her cross-examination of Detective Gardiner that he did not search [Petitioner's] car on October 23, but briefly went into it to get some information from a McDonald's receipt. Defense counsel used this testimony during her closing argument to imply that cash was planted in the car on the morning of October 23, to be discovered later that evening by Deputy Harris. Clearly, the trial court's ruling did not prevent [Petitioner] from presenting to the jury evidence and argument relevant to one of his theories of defense.

*Id.* at *5–6.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id*. at 67–68. The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). The court of appeals' conclusions that the trial court's evidentiary rulings in question did not violate Petitioner's rights under state law are, therefore, axiomatically correct.

It is possible that an evidentiary ruling—even a ruling that is axiomatically correct under state law—still violates due process. State-court evidentiary rulings can rise to the level of due process violations if they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.

20

2000) (quotation marks omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "a Supreme Court case establishing a due process right with regard to the specific kind of evidence at issue"). Petitioner, however, has not met this difficult standard.

Petitioner's second and third grounds for relief do raise the specter of a violation of the Confrontation Clause. The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. Const. amend VI; *Pointer v. Texas*, 380 U.S. 400, 403–05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). While the Confrontation Clause guarantees an opportunity for effective cross-examination, it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is

concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; *see also United States v. Adams*, 722 F.3d 788, 834 (6th Cir. 2013); *King v. Trippett*, 192 F.3d 517, 524 (6th Cir. 1999).

In habeas ground II, Petitioner contends that the trial court interfered with defense counsel's cross-examination of Deputy Gardiner by "threaten[ing] the defense with retaliation but disguis[ing] it as 'opening the door' if she chose" to question Deputy Gardiner about the lawfulness of his search of Petitioner's car. (Pet., ECF No. 1, PageID.7.) On the third day of trial, before the jury was seated and before Deputy Gardiner took the stand to continue his testimony, the prosecutor addressed how defense counsel had continued to question officers "regarding the merits of the search and why they were searching." (Trial Tr. III, ECF No. 11-7, PageID.1164.) The prosecutor asserted that such questioning was not relevant because Petitioner "was on parole and it was a condition of his parole that searches be allowed at any time without a warrant." (*Id.*, PageID.1165.) The prosecutor noted that defense counsel was trying to accuse officers of planting evidence, and that "if there is a valid reason for being in the car the jury can't know that because of the reason [Petitioner] was on parole." (*Id.*, PageID.1167.)

In response, defense counsel noted that the proposed questioning was relevant because "every time that car is entered it is relevant. There is a chain of custody that shows the key being turned in and turned out that we got into." (*Id.*, PageID.1168.) The trial court and defense counsel then engaged in the following exchange:

> THE COURT:  Well if the Court is going to allow you to question you're going to have to [be] very careful because there's a possibility that you're going to open a really big door. That's your choice.
>
> MS. GARRITY: I will qualify it by saying you had the right to go in there. Quite honestly, I would have never filed a motion to say any of the searches—once the

22

car is impounded it's absolutely part of—they have it, they have an absolute right to search a million times.

THE COURT: But as Ms. Kasson has accurately pointed out, the jury doesn't know that. And the inference you're making clearly is that the police conducted some type of inappropriate behavior that was illegal and so that's fine, you make your argument, but what I'm telling you is you're going to open the door if you're not careful.

(*Id.*, PageID.1168–1169.)

Petitioner's assertion that the trial court explicitly directed defense counsel not to question Deputy Gardiner about the validity of his search of Petitioner's car is belied by the exchange above. Instead of limiting defense counsel's cross-examination, the trial court warned counsel that if she continued to ask Deputy Gardiner about the validity of the search, she could open the door to admission of testimony regarding Petitioner's parole status and conditions thereof, as well as evidence concerning Petitioner's prior crimes. The record reflects that trial counsel heeded that warning and indirectly conceded the legality of the search during her cross-examination of Deputy Gardiner. (*See, e.g.*, Trial Tr. III, ECF No. 11-7, PageID.1189, 1191.) Moreover, even with following this warning, defense counsel was able to elicit testimony to support the defense theory that law enforcement officers planted the cash found in Petitioner's car between the October 16th search by Detectives Lytle and Gardiner, which turned up nothing, and the October 24th search by Deputy Harris, which resulted in finding the cash. For example, defense counsel was able to have Deputy Gardiner admit that he went into the car on October 23rd but did not search it; instead, he "wanted to get some information off a receipt." (*Id.*, PageID.1192.) Counsel then relied on that testimony during closing arguments to suggest that Deputy Gardiner planted the money when he entered the car on October 23rd. (Trial Tr. IV, ECF No. 11-8, PageID.1501–1504.)

In light of the foregoing, any cross-examination by counsel regarding the legality of the search would have been prejudicial to Petitioner because it could have opened the door to

admission of testimony regarding Petitioner's parole status and conditions thereof, as well as evidence concerning Petitioner's prior crimes. The trial court's warning was neither contrary to, nor an unreasonable application of, clearly established federal law, as *Van Arsdall* explicitly authorizes limitations on cross-examination based upon prejudice. Petitioner, therefore, is not entitled to relief with respect to habeas ground II.

In habeas ground III, Petitioner contends that the trial court improperly limited defense counsel's cross-examination of Deputy Gardiner by "order[ing] the defense counsel to move on from the affidavit questions [and] not allowing impeachment of [the] witness." (Pet., ECF No. 1, PageID.8.) Petitioner contends that Deputy Gardiner "simply pawn[ed] everything he wrote in multiple affidavits on [third parties] without allowing the defense to question who gave him which information." (*Id.*)

During cross-examination, defense counsel asked Deputy Gardiner about the various search warrant affidavits he prepared for Petitioner's case. (Trial Tr. III, ECF No. 11-7, PageID.1171.) Deputy Gardiner testified that he did not recall speaking with Charles Crim, the gas station manager, about eight months after the October 2018 incident. (*Id.*, PageID.1172–1173.) Counsel then impeached Deputy Gardiner about the discrepancy between such testimony and his affidavit, which stated that "the affiant was advised by the employee specifically that the person who robbed the store was the same person and that he followed the robbery." (*Id.*, PageID.1173–1174.) Counsel offered to show the affidavit to Deputy Gardiner to refresh his memory. (*Id.*, PageID.1174.) Deputy Gardiner then stated: "I don't remember exactly if I spoke to him on October 16th or not. I really don't. I know I spoke to him in June when I did the supplemental report." (*Id.*)

Defense counsel then asked Deputy Gardiner about another affidavit, in which he wrote that the "suspect vehicle eventually got on US 131 where the employee followed him." (*Id.*, PageID.1175.) The prosecutor objected, asserting hearsay and improper impeachment. (*Id.*) The trial court responded that it was not sure that defense counsel had laid a proper foundation for impeachment. (*Id.*) Defense counsel continued to question Deputy Gardiner about the statements in the affidavits that were based upon observations made by other officers, leading to another objection by the prosecutor, stating that defense counsel was trying to impeach Deputy Gardiner with hearsay from other witnesses. (*Id.*, PageID.1177.) The trial court noted that if "it's a statement that [Deputy Gardiner] got from another officer then that officer is the one that should be questioned about it, not this officer." (*Id.*) The trial court then told defense counsel that it was "not going to allow [defense counsel] to ask that question." (*Id.*, PageID.1177–1178.) Counsel then moved on from asking Deputy Gardiner about the affidavits.

Again, the state courts' conclusion that defense counsel's attempts to impeach Deputy Gardiner with hearsay statements from other officers were improper under state law is axiomatically correct. *See Wainwright*, 464 U.S. at 84; *see also Bradshaw*, 546 U.S. at 76. Moreover, Petitioner cites no authority suggesting that the trial court's evidentiary ruling conflicted with a decision reached by the Supreme Court *See Sanders*, 221 F.3d at 860; *see also Stewart*, 967 F.3d at 538. The trial court had "wide latitude" to limit defense counsel's attempt to improperly impeach Deputy Gardiner and imposing that limit did not violate Petitioner's rights under the Confrontation Clause. *See Van Arsdall*, 475 U.S. at 679. Moreover, the limitation did not undermine Petitioner's defense. By questioning Deputy Gardiner about the affidavits, defense counsel's goal was to try to impeach Deputy Gardiner's credibility by suggesting that he lied under oath by including information from other officers in the affidavits yet attributing such information

25

to himself as the affiant. Before the trial court imposed the limitation on defense counsel's questioning, the jury heard the exchange between counsel and Deputy Gardiner regarding certain statements from the affidavits. That testimony would have permitted the jury to reach the conclusion that Petitioner and counsel sought if it was so inclined.

Because *Van Arsdall* authorizes limitations on cross-examination, Petitioner cannot demonstrate that the state courts' rejection of his claim that the trial counsel impermissibly limited counsel's cross-examination and attempted impeachment of Deputy Gardiner was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief with respect to habeas ground III.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full

26

merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

<u>**Conclusion**</u>

The Court will enter a judgment denying the petition and an order denying a certificate of appealability.

Dated:  <u>    May 3, 2024    </u>          <u>  /s/ Jane M. Beckering                    </u>
                                                   Jane M. Beckering
                                                   United States District Judge

27